GRIFFIN, Judge.
Appellants Robert Winslow, Alton Louder-milk, and Kim Evans, plaintiffs below [collectively “Landlords”], appeal the lower court’s summary final judgment in favor of First Union National Bank of Florida [“First Union”], defendant below. The appeal concerns the interpretation of a ground lease on prop *87 erty owned by Landlords and whether the terms of that lease required First Union to obtain Landlords’ approval to alter the leasehold premises. Because we conclude that material facts remain unresolved, we reverse.
In November 1980, Florida Federal Savings and Loan Association [“Florida Federal”] leased certain lands within the Palm Coast development in Flagler County from ITT Community Development Corporation [“ITT CDC”]. Florida Federal, under the terms of that ground lease, constructed a building to house a savings and loan and surrounding improvements which included a parking lot, sidewalks, lighting fixtures and landscaping. In December 1985, ITT CDC sold the property to Landlords, subject to Florida Federal’s lease.
In November 1990, the Federal Office of Thrift Supervision, took over Florida Federal’s assets and appointed the Resolution Trust Corporation [RTC”] as receiver. The RTC operated the financial institution located on the premises until August 1991. First Union then acquired the deposit base of the defunct Florida Federal and entered into an agreement with the RTC giving First Union the option to acquire the leasehold.
On August 20, 1991, First Union wrote Landlords to request authorization to install a satellite dish and to erect a First Union sign on the premises. Landlords agreed. Upon further approval by the Palm Coast Commercial Architectural Review Committee, apparently for compliance with the covenants and restrictions of the Palm Coast development, the sign and satellite dish were erected.
Thereafter, on September 16, 1991, First Union transmitted to Landlords a proposed modification of the lease agreement and a consent to a proposed amendment to the restrictive covenants and easements governing the Palm Coast development,[1] suggesting that First Union would not take the assignment of the lease unless Landlords agreed to these modifications and amendments. Landlords refused. Also, on September 16, 1991, First Union, in a telephone conversation with one of the Landlords, requested Landlords’ permission to further alter the property by adding a drive-through teller lane, placing a canopy over the additional drive-through teller lane, and installing an ATM machine on the premises, but Landlords refused. First Union did not request Landlords’ approval of the addition of the drive-through teller and ATM in writing and made no further effort to obtain approval prior to construction.
Notwithstanding Landlords’ verbal refusal of First Union’s verbal request, First Union proceeded to submit the construction plans for the additions to the Palm Coast Commercial Architectural Review Committee, for its approval. The record suggests this committee is an arm of the developer, ITT CDC, whose purpose is to review proposed commercial developments for consistency with the development’s covenants and restrictions. There is nothing in the exchange of correspondence between this committee and First Union suggesting that its approval for the alterations to the property was anything other than the ordinary approval process for which a standard $75 fee was paid; no suggestion is made that approval was expressly sought from the Committee in any capacity as designee of Landlords or that the Palm Coast Commercial Architectural Review Committee had any awareness that the approval being sought was landlord/designee approval under the lease. By January 1992, the Palm Coast Commercial Architectural Review Committee had given its approval. First Union began construction.
In late February 1992, after observing that construction was underway, Landlords notified First Union by letter that they were electing to terminate the leasehold, pursuant to the default provision contained in section 22[2] of the lease, because First Union had *88 failed to obtain Landlords’ authorization be-' fore making improvements to the property. Landlords cited section 7(c) of the ground lease,[3] which states:
Notwithstanding the provisions set forth in the preceding Paragraph, at least sixty (60) days prior to any site work or construction upon the Demised Premises, Tenant shall make mitten application to the Landlord, or Landlord’s designee, for approval of the plans ... to be constructed on the Demised Premises. Tenant shall not construct or make any improvements to the Demised Premises, without prior written approval from the Landlord, or Landlord’s designee. [Emphasis added].
In an apparent effort to satisfy the requirement of section 22 that Landlords give notice and opportunity to cure nonmonetary defaults, Landlords asserted that they had contacted First Union thirty days earlier by telephone about this issue but that First Union had not responded. On March 9, 1992, First Union, through counsel, replied to Landlords’ letter and informed them that “pursuant to section 7(c) of the lease, First Union has obtained written permission from Landlords’ designee for construction of the drive-through banking facility at the above-referenced site.” The Palm Coast Commercial Architectural Review Committee was identified as the source of this approval as Landlords’ “designee.”
First Union’s basis for asserting that the Palm Coast Commercial Architectural Review Committee was Landlords’ “designee” is section 7(a) of the lease, which provides:
Tenant shall have the right, at its own cost and expense, to construct on any part or all of the Demised Premises, subject to covenants, restrictions and easements of record, such buildings, parking area, driveways, walks, gardens, and other similar improvements necessary to carry out the business purposes of Tenant, as set forth in Section 5 of the Lease, provided that the same shall be in compliance ivith the Rules and Regulations of the Architectural Committee of Landlord and then applicable building codes and ordinances. [Emphasis added.]
First Union informed Landlords that because it had obtained the consent of the Palm Coast Commercial Architectural Review Committee, as Landlords’ “designee,” it did not need Landlords’ consent. Nevertheless, First Union also requested Landlords’ belated consent, suggesting that Landlords’ failure to consent to the construction, which by now was complete, would be “unreasonable.”
On March 12, 1992, Landlords responded to First Union, inquiring how First Union could believe that submitting plans to a community association’s architectural review board could obviate the need for Landlords’ permission to construct improvements on the property. The record does not reflect whether First Union made any effort to answer this question. On April 4, 1992, Landlords filed a complaint against First Union for eviction and ejectment. On April 25, 1992, First Union proceeded to formally exercise its option to purchase the leasehold[4] *89 from RTC. On May 27th the bank' took RTC’s assignment of the lease.
On March 8, 1993, First Union filed an Amended Motion for Summary Judgment on Plaintiffs Complaint and on Defendant’s Counterclaim for declaratory relief. After conducting a hearing on the motion, the trial court issued a detailed order explaining the decision to enter final summary judgment in favor of First Union. The order is too lengthy to reproduce in full; however, the following is the lower court’s own summary of the issues presented and its rulings.
The issues for determination by the Court, as raised by the Plaintiffs’ pleadings, are as follows:
1. Whether First Union National Bank of Florida (“First Union”) was required to seek Plaintiffs’ approval prior to accepting assignment of the tenant’s interest in the ground lease.
2. Whether First Union’s construction of improvements to the property constituted a default under the lease agreement.
3. Whether Plaintiff waived any breach of the lease agreement by First Union.
4. Whether Plaintiffs have presented the Court with sufficient allegations to support their claims for Fraudulent Misrepresentation and/or Tortious Interference with a Business Relationship.
With regard to these issues the Court finds as follows:
1. First Union was not required to seek Plaintiffs’ consent prior to accepting assignment of the lease agreement.
2. First Union’s construction of improvements did not constitute a default under the lease agreement. First Union properly received approval of its plans from the Landlord’s unrevoked desig-nee, the Palm Coast Architectural Committee. Additionally, had Plaintiffs failed to give their consent to the proposed construction which was commercially reasonable, Plaintiffs would have breached then- implied warranty of good faith, implicit in the terms of the lease agreement.
3. Plaintiffs waived any breach of the lease agreement with regard to the construction by failing to allow First Union its contractually mandated opportunity to cure nonmonetary defaults.
4. Plaintiffs have failed to show First Union made material misrepresentations upon which Plaintiffs justifiably relied to their detriment. Further, the record indicates that the property value and the value of Plaintiffs’ reversionary interest did not decline as a result of First Union’s improvements to the property. Also there is no indication in the record that Plaintiffs’ obligations under the lease, as assigned to First Union, have been changed or increased in anyway by First Union’s exercise of the option. Plaintiffs’ claims for both fraudulent misrepresentation and tortious interference are based solely upon First Union’s exercise of its statutorily authorized option to accept assignment of the lease from the RTC. Since exercise of the option was proper, this action by First union cannot form the basis for Plaintiffs’ tort claims.
Because our analysis of this case differs from that of the lower court on the threshold issue of First Union’s breach, we find it necessary to remand for further proceedings.
It is not disputed by First Union that prior to construction of the improvements, it did not seek consent in .writing from Landlords. First Union also does not challenge Landlords’ assertion that when consent was requested verbally, it was refused. First Union’s position is that these facts are of no legal significance because it was entitled to make improvements by securing approval from the Palm Coast Commercial Architectural Review Committee as Landlords’ “des-ignee.”
First of all, there is simply no basis for First Union’s contention that the Palm Coast Commercial Architectural Review Committee was ever any Landlords’ designee for purpose of giving Landlords’ approval for construction of improvements or additions under the leasehold. The only basis First Union puts forth is the above-quoted phrase contained in section 7(a). That section merely *90 specifies that any improvement to the leasehold has to comply with the community’s rules and regulations as well as applicable building orders. Plainly all that “Architectural Committee of landlord” means is that it is the ITT CDC Architectural Committee. This language offers no basis for a conclusion that the Palm Coast Commercial Architectural Review Committee was Landlords’ “desig-nee” for obtaining Landlords’ approval of alterations to the leasehold, as required by the lease. To the contrary, the fact that no connection was made anywhere in section 7 between the Palm Coast Commercial Architectural Review Committee and Landlords’ “designee” suggests that Landlords did not intend to delegate its Landlords’ right of consent to the Committee. Having so concluded, we need not address First Union’s equally weak second argument that when the landlord changed, the former landlord’s “des-ignee” was still empowered to approve any proposed changes to the new landlord’s property. Similarly perplexing is First Union’s position that it could satisfy its leasehold obligations by obtaining consent for the improvements from Landlords’ designee after having been expressly denied consent by Landlords.
In sum, we conclude the position taken by First Union that it did not breach the lease by constructing improvements without obtaining Landlords’ consent is wrong. That does not mean Landlords should prevail, however. Landlords’ performance under the lease was also deficient. Rather than follow the terms of section 7(c) of the lease quoted in its letter, which required Landlords to give written notice of the breach and a thirty day opportunity to cure, Landlords improperly attempted to terminate the lease prematurely. First Union appropriately, if grudgingly, responded to Landlords’ default letter in an effort to cure the breach by asking for consent. Consent was not given. The question thus becomes whether Landlords’ refusal to give consent, when requested on March 9, 1992, was reasonable.
We agree with the lower court that this Landlords’ power to refuse consent was extremely narrow. The lease gave the tenant the right to make improvements that conformed with applicable rules, regulations and codes. The improvements in question were consistent with the intended use of the property, were unobjectionable in design or construction and Landlords conceded that they probably enhanced the value of the property. Landlords’ argument that the power of consent contained in the lease was designed to give Landlords the right to demand more rent is without support.
We do not conclude, however, that Landlords were powerless to refuse the proposed improvements. The scope of Landlords’ right to refuse consent is unclear in this lease. The tenant plainly has the right to make alterations but the tenant’s duty to seek and obtain consent implies some power on the part of Landlords to refuse. Parol evidence, if available, may clear up this ambiguity. Landlords had been told at the time of the initial request that First Union’s assumption of RTC’s lease was “subject” to Landlords’ agreement to a series of substantial lease modifications. The clear implication of the letter is that if Landlords did not agree, First Union would not assume the lease and the RTC would repudiate. Refusal to consent to additions under those circumstances might be reasonable. Even by March 1992, First Union could only represent that it had finally exercised the option and “would shortly become the tenant.” In other words, the “future tenant” was asking for consent to improvements it had already constructed under a lease it had not yet assumed. Notwithstanding Landlords’ frustration at these circumstances, it does appear that by March 1992 Landlords had no reasonable basis to refuse First Union’s belated consent to the alterations. However, the very limited record in this case, especially concerning what was occurring during this time period, does not permit a determination of this issue as a matter of law and will not presently support a summary judgment on this point.[5]
The final issue we address is the lower court’s conclusion that Landlords’ refusal to permit First Union to cure the breach *91 constituted a waiver of Landlords’ right to require strict performance of the lease agreement. We cannot see how this is a “waiver.” Nor can we find waiver in the parties’ subsequent unsuccessful agreement to explore First Union’s purchase of the property as a way of settling the dispute.
First Union’s best waiver argument is that their breach was waived by Landlords’ continued acceptance of rent. In some instances, Landlords’ acceptance of rent in face of a known breach by tenant can be a waiver; however, in a ease such as this where Landlords acted promptly to terminate the lease based on the breach of a nonmonetary covenant, commenced legal action to secure possession and did nothing to cause First Union to believe it would not stand on its right of consent, Landlords did not waive First Union’s breach by collecting rent during the tenant’s continued occupancy after notice of termination of the lease was delivered.
We therefore remand for further proceedings.
REVERSED and REMANDED.
THOMPSON, J., concurs.
DAUKSCH, J., concurs and concurs specially, with opinion.

. The amendment would have to be executed by ITT CDC which evidently had this amendment power as developer.

. “(4) Tenant’s failure to perform any of the other covenants, conditions and agreements herein contained on Tenant’s part to be kept or performed, and the continuance of such failure without the curing of same, with the exception of nonpayment of annual base rent, or additional rent for a period of thirty (30) days after receipt by Tenant of notice in writing from Landlord specifying in detail the nature of such failure, and provided Tenant shall not cure said failure *88 as provided in this Section; then, Landlord may, at its option, give to Tenant a notice of election to end the term of this Lease upon a date specified in such notice, which date shall not be less than ten (10) business days (Saturdays, Sundays and legal holidays excluded) after the date of receipt by Tenant of such notice from Landlord, and upon a date specified in said notice, the term and estate hereby vested in Tenant shall cease and any and all other right, title and interest of Tenant hereunder shall likewise cease without further notice or lapse of time, as fully and with like effect as if the entire term of this Lease had elapsed, but Tenant shall continue to be liable to Landlord as hereinafter provided."

. Subsection 7(e) of the ground lease also appears relevant:
Tenant may, at its own cost and expense, make such alterations, changes, replacements improvements and additions in and to the Demised Premises, and the buildings and improvements thereon, including the demolition of any building(s) and improvement(s) and/or structure(s) that now or hereafter may be situated or erected on the Demised Premises, providing Tenant has the prior written approval of the Landlord, or Landlord’s designee, and same shall be in compliance with the then applicable building codes and ordinances....

. Under the terms of the purchase and assumption agreement with the RTC, First Union was required to exercise its option to take the lease within 90 days from the Association's closing on August 2, 1991. Nevertheless, the parties appear to agree that First Union did not exercise the option until April of 1992.

. We find no merit to any of Landlords' remaining issues on appeal and will not address them.